IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2022

## STATE OF TENNESSEE v. DARRELL LOVE

**Appeal from the Circuit Court for Madison County**
**No. 19-689      Donald H. Allen, Judge**

## No. W2021-00233-CCA-R3-CD

Aggrieved of his Madison County Circuit Court jury convictions of aggravated assault and reckless endangerment, the defendant, Darrell Love, appeals, challenging the sufficiency of the convicting evidence, the trial court's exclusion of certain evidence, and the trial court's failure to instruct the jury on self-defense. Discerning no error, we affirm.

## Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JILL BARTEE AYERS, J., joined.

William J. Milam, Jackson, Tennessee, for the appellant, Darrell Love.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jody Pickens, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Madison County Grand Jury charged the defendant with aggravated assault and felony reckless endangerment for events that occurred during an argument between the defendant and the victim, Johnny Postles, on August 20, 2019.

At the defendant's September 17, 2020 trial, Mr. Postles testified that at approximately 5 p.m. on August 20, 2019, he went to pick up his teenaged daughter, K.P., from the apartment she shared with her mother, Katina Fuller. He recalled that he had received a message from K.P.'s school at 4:56 p.m. indicating "that all new students that were going to Jackson State needed to be at her high school at 5:15 and it was going to last until 6:00." He telephoned Ms. Fuller, who had received the same message, and the two arranged for Mr. Postles to pick K.P. up at Ms. Fuller's home. He also telephoned K.P.

and "told her to get ready because I'm going to take you." K.P. "tried to come up with an excuse," telephoning Mr. Postles three times before he arrived "trying to get out of going."

Mr. Postles testified that when he arrived outside Ms. Fuller's apartment, he blew the horn and waited in his car in front of Ms. Fuller's apartment for a while before going to the door. When he knocked on the door, the defendant, who was Ms. Fuller's boyfriend at the time, "comes [and] opens the door and I said, you know, could you tell my daughter to come out." Mr. Postles returned to his car, and Ms. Fuller sent him a text message saying that K.P. "will be out in a minute." Mr. Postles said that when K.P. came out of the apartment, "she's walking like a turtle with a broken leg. She's just walking real [sic] slow and she doesn't have her shoes on. She's got some little footies and she's just fiddling with her phone, you know." When she got into the car, Mr. Postles told K.P., "'[T]he next time I tell you to do something and you go running to your mom trying to get out of it, you are going to be in trouble.'" He said that K.P. "starts giving me mouth, so I popped her on the leg again." At that point, K.P. "grab[bed] the door and open[ed] it" despite that the vehicle was still moving.

Mr. Postles testified that he grabbed K.P.'s arm and pressed the accelerator "so the door would close. She sticks her foot out so the door won't close. So since she's cutting up, I just stopped the car and let her get out and she walks back to her mom." Mr. Postles backed his vehicle the "10 feet" to Ms. Fuller's apartment and parked his car. Ms. Fuller was "talking to [K.P.] trying to figure out . . . what's going on because she looks like she is fixing to cry." K.P. "wouldn't say anything because she knew she was wrong." Mr. Postles testified that he urged Ms. Fuller to talk to him instead of K.P. At that point, the defendant, who had been inside, came out of the apartment and told Mr. Postles to leave K.P. alone. Mr. Postles said that he told the defendant, "this doesn't concern you," and the defendant reached underneath his shirt, pulled out a gun, and pointed it at Mr. Postles.

Mr. Postles testified that when the defendant began walking toward him with the weapon raised, he "thought I was fixing to die. I thought he was fixing to shoot me in my face." Mr. Postles "turned around and when I turned my back to him he came up behind me and when I felt the gun touch the back of my head, I bent down." Mr. Postles recalled that, as he "bent down, I heard this God awful sound. The gun went off." He said that he "felt the gun" "touch my skin" behind the left ear. Mr. Postles said that he "grabbed [his] head" because he thought he had been shot. When Mr. Postles realized that he had not been shot, he "took off the other way and called 911." Later, he visited the emergency room for ringing in his ear and was diagnosed with hearing loss "in my left ear" due to the discharge of the weapon so close to his ear.

Mr. Postles said that Ms. Fuller and K.P. were close enough to him to touch when the defendant came out with the gun and when it discharged. In addition to those

-2-

two, other people were milling about the parking lot. While Mr. Postles ran to call 9-1-1, the defendant went back inside. Mr. Postles testified that he remained on the opposite side of the parking lot until he "saw the police car come through," at which point, he walked back toward Ms. Fuller's apartment.

During cross-examination, Mr. Postles acknowledged that he knew that K.P. did not want to attend the school function. He admitted that he "popped" K.P. "on the leg" two times after "she was mouthing off." He conceded that he accelerated when K.P. tried to get out of the vehicle but said that he did so "to close the door. To try to make the door close because I had her by the arm." He denied grabbing his daughter by anything other than her arm. Mr. Postles agreed that K.P. provided a sworn statement in another proceeding that contradicted this claim but said that Ms. Fuller "coached her into saying something different."

Mr. Postles admitted that he was "frustrated" when he got out of his vehicle and walked back toward the apartment, explaining that he "believe[d] something was said in that house to undermine my authority and that's why it took forever for her to come out." Mr. Postles denied getting in Ms. Fuller's face or raising his voice.

Fifteen-year-old K.P. testified that on August 20, 2019, Mr. Postles wanted her to attend an event at her high school that she believed "wasn't necessarily for me, it was for the seniors and juniors that were going to Jackson State." K.P. said that she did not want to attend the event because she "had a lot of homework . . . and also the event wasn't for me which I explained to him also and I also was out of my school uniform and I had to do my hair." Nevertheless, K.P. got ready to go, and Mr. Postles came to her mother's apartment to pick her up.

K.P. testified that when she got into Mr. Postles' vehicle, he "seemed very mad" and told her that she was "going to get it" and "spanked" her "on the leg." She testified that she "was confused at the time exactly what he meant." K.P. said that she "was kind of getting scared as he was like hitting me more and more. He started to spank my leg and my arm and then I was getting scared." At that point, K.P. decided that she was "going to get out of this car if you're going to be hitting me the whole time." She opened the car door, and Mr. Postles "started to pull on me, my clothes and my hair." She screamed "because I was scared," and Mr. Postles accelerated. K.P. said that she "used more force to try to get out of the car," so Mr. Postles stopped the car and allowed her to get out.

After she got out of the vehicle, K.P. walked toward the apartment "to go get my mom because they were about to leave." She said that she was "kind of like crying and stuff" as she walked and that Ms. Fuller came out of the apartment and asked her what was wrong. K.P. recalled that she "couldn't really speak at the time because I was in shock

-3-

about what happened and I was scared . . . and I couldn't really get it out what happened." The defendant, who "knew I had just c[o]me out of the car from my dad," asked K.P. what was wrong "and I couldn't get my words out, but I was still like crying and like kind of in shock." At that point, Mr. Postles "drove back to the apartment and . . . he had got out of the car" and said "let's go." K.P. testified that she told Mr. Postles that she did not want to go with him. Ms. Fuller and Mr. Postles "was going back and forth." The defendant, she said, "had walked away and I had thought he had went back in the apartment just trying to cool down." Instead, the defendant "came back out with the gun and he had hit the side of my dad's head and that's when the gun went off." She recalled that Mr. Postles was facing her and Ms. Fuller and that the defendant approached Mr. Postles "from behind" and "smacked [the gun] against my dad's head" one time. Mr. Postles "had his arms raised up." K.P. testified that Mr. Postles "ducked and went away somewhere I guess to go call the police."

K.P. testified that she "was in a little bit of shock" after the gun went off. She said that she and Ms. Fuller stood with the defendant for "a few minutes" before going back into the apartment. The police arrived a short time later. She provided a statement to the police.

During cross-examination, K.P. testified that Mr. Postles struck her on both her arms and legs and that she was afraid of him. She said that the incident "felt like a kidnapping sort of."

Billy Cathey, who was working as a patrol officer for the Jackson Police Department on August 20, 2019, testified that he responded to Mr. Postles' 9-1-1 call and that he spoke to Mr. Postles in the parking lot before going to the apartment. Ms. Fuller answered the door, and the defendant was seated inside. The defendant told Officer Cathey that he had "intervened" in an argument between Mr. Postles and Ms. Fuller and that he had "produced the handgun from his waistband and slapped [Mr. Postles] with the handgun." The defendant told Officer Cathey that the gun discharged when he struck Mr. Postles. Ms. Fuller showed Officer Cathey the gun where it had been hidden "in the bedroom underneath the mattress." The gun "was loaded," and "there was a shell casing in the chamber that didn't eject." Officer Cathey arrested the defendant and charged him with the aggravated assault of Mr. Postles.

Katina Fuller testified on behalf of the defendant that on August 20, 2019, she lived at 701 Chapel Ridge Drive with her three children. The defendant, her boyfriend of 13 years, did not live there but "was there a lot." On that date, Mr. Postles and K.P. "were discussing going somewhere that afternoon, a school function." K.P. did not want to go because she had a lot of homework and because the event "was for upper classmen." Ms. Fuller told K.P. "to go ahead and get ready." K.P. was not ready when Mr. Postles

-4-

knocked at the door, so the defendant told Mr. Postles that K.P. "would be out in a minute." Mr. Postles knocked again a short time later, and this time he "was upset," so Ms. Fuller told K.P "to hurry up and get ready her daddy is outside and he is still waiting." When Mr. Postles knocked on the door a third time, Ms. Fuller "went out there and spoke with him and told him [K.P.] would be coming down in a minute, you know, she was trying to get ready. You know how girls are." She described Mr. Postles' demeanor as "irritated" and "upset."

Ms. Fuller testified that when K.P. finally left with Mr. Postles, Ms. Fuller "was still in the house" and the defendant "was in the car waiting for me because we were fixing to go get something to eat." She said that when she got into the car with the defendant, he told her that "it looked like" K.P. and Mr. Postles "were arguing" and that "it looked like it was pretty serious." Ms. Fuller recalled that as they were "backing out, my daughter is walking up the parking lot with her shoes in her hand and she's crying and hollering." Ms. Fuller said that the defendant pulled the car back into the parking space and that she got out to see what was going on. At the same time, Mr. Postles was backing his vehicle back toward Ms. Fuller's apartment. Ms. Fuller testified that K.P. was crying and that she "couldn't understand what she was saying." Mr. Postles, who was "[v]ery angry," walked over and told Ms. Fuller that she "needed to ask him what happened and not" K.P. Ms. Fuller said that she told Mr. Postles, who was standing very close to her, to leave. By that time, the defendant had also begun "hollering because he saw [Mr. Postles] hollering at me."

The defendant and Mr. Postles "were yelling back and forth," so Ms. Fuller told the defendant to "let me take care of it." She said that the defendant "went into the house and that she and Mr. Postles continued "just arguing." Ms. Fuller recalled that, at one point, Mr. Postles began backing up. The defendant then "comes up behind me and he points a gun at" Mr. Postles. Mr. Postles left. Ms. Fuller said that she regretted the defendant's having intervened even though she "felt like he was defending us."

During cross-examination, Ms. Fuller agreed that the defendant immediately intervened in her argument with Mr. Postles. She acknowledged that there were at least three or four other residents in their general area and that her eight-year-old son was nearby. Ms. Fuller admitted that Mr. Postles was not armed and that she did not ask the defendant to go inside and get the gun, which Ms. Fuller claimed belonged to her. She could not remember what kind of gun it was and could not provide a more specific description than "[a] handgun." Ms. Fuller conceded that her dispute with Mr. Postles was entirely verbal and that "nothing physical" occurred until the defendant came out with the gun. Mr. Postles did not threaten her with violence. She said that Mr. Postles began "backing up" as the defendant was "walking up" with the gun. Ms. Fuller testified that she shouted at the defendant because she did not think it was necessary for him to go and get a gun. Ms.

Fuller claimed that, at that point, the defendant "put the gun down" and that "[a]s he was putting the gun down I guess it shot out or backfired or something." She admitted that she told the police that the defendant struck Mr. Postles with the gun, but she insisted that the defendant actually never got within "seven feet" of Mr. Postles. She said that she had only "thought" that the defendant had struck Mr. Postles because the gun discharged.

After the gun went off, Mr. Postles ran away. Ms. Fuller said that she "hollered at" the defendant "[b]ecause I thought it was uncalled for" and then "ran in the house." Ms. Fuller speculated that the defendant put the gun "back under the mattress because that's where I retrieved it from when the police officers asked me for it." Ms. Fuller agreed that although she testified on direct examination that she was frightened during her argument with Mr. Postles, the situation did not necessitate the defendant's getting the gun and becoming involved.

The defendant testified that on August 20, 2019, he lived with Ms. Fuller and her children and that on that day, Mr. Postles arrived while K.P. "was in the bathroom getting ready, but she really don't want to go . . . so she is really stalling." After K.P. left with Mr. Postles, the defendant and Ms. Fuller walked outside to their car. The defendant said that he saw Mr. Postles "fussing at" K.P. and told Ms. fuller that Mr. Postles was "probably going to put his hands on her. Before I even got the words out of my mouth, he had already did it." The defendant recalled that as he backed his car out of the parking space, he saw K.P. "coming down the sidewalk" "crying and barefooted, and scared and shaking and the whole nine." The defendant said that Mr. Postles backed his vehicle up and then "jumps out of the truck all in [Ms. Fuller's] face like this like he's fixing to do something."

According to the defendant, he "was scared of" Mr. Postles "[b]ecause . . . of what I know." He claimed that he thought Mr. Postles, who was unarmed, might harm Ms. Fuller or K.P., so he "went in the house and I grabbed the gun and I come back outside." The defendant said that when he came "back outside I thought he was about to do something to her, so I walked up and pointed the gun at" Mr. Postles. He testified that he told Mr. Postles to back up and that Mr. Postles "backed up and when he turned around I brought my arm down and the round jump[ed] off the firearm and that was it." The defendant speculated that he "squeezed the trigger and the round came out and went into the ground" when he "brought my arm down." The defendant "went in the house and put the gun back under the mattress" after "the shot went off."

During cross-examination, the defendant agreed that Mr. Postles was not armed and that Mr. Postles did not initiate a physical altercation with Ms. Fuller. The defendant adamantly denied striking Mr. Postles with the gun and said that all of the other witnesses only "thought that" the defendant had done so "when the gunshot went off." He

-6-

maintained that he "was probably about seven feet" away from Mr. Postles. The defendant denied telling Officer Cathey that he did hit Mr. Postles explaining that he told Officer Cathey that he "wanted to hit" Mr. Postles but "[m]aybe he got my statement mixed up." He admitted that he had his finger on the trigger, that the safety was off, and that he had the gun pointed at Mr. Postles even though Mr. Postles had done nothing more than argue with Ms. Fuller. The defendant conceded that he went into the house after Ms. Fuller told him to let her handle the situation and that he armed himself before going back outside and reinserting himself into their argument, which had not changed in character or intensity.

Based on this evidence, the jury convicted the defendant as charged of aggravated assault and felony reckless endangerment. Following a sentencing hearing, the trial court imposed a total effective sentence of six years' incarceration. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence, the trial court's exclusion of Mr. Postles' record of criminal convictions and prior bad acts, and the trial court's refusal to provide a self-defense instruction to the jury.

*I. Sufficiency*

The defendant first asserts that the evidence was insufficient to support his convictions given that Mr. Postles' testimony was contradicted by that offered by other witnesses. The State contends that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits aggravated assault who" "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and the assault . . . [i]nvolved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iii). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2). "A person commits an

offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id.* § 39-13-1039(a). "Reckless endangerment committed with a deadly weapon is a Class E felony." *Id.* § 39-13-103(b). "'Deadly weapon' means . . . [a] firearm." *Id.* § 39-11-106(6).

We must decline the defendant's invitation to reevaluate the credibility of the witnesses or revisit inconsistencies in the testimony because both fall solely within the purview of the jury as the trier of fact. *See Cabbage*, 571 S.W.2d at 835. The evidence adduced at trial established that Mr. Postles engaged in an argument with Ms. Fuller after the incident with K.P. The defendant inserted himself into the argument, and Ms. Fuller told him to go inside and let her handle the situation. Mr. Postles did not threaten Ms. Fuller or the defendant with death or serious bodily injury. Nevertheless, the defendant went into the apartment and armed himself with a handgun. He then went outside, pointed the loaded weapon at Mr. Postles, and then, in the light most favorable to the State, struck Mr. Postles in the head with the gun, causing it to discharge. In addition to Mr. Postles, Ms. Fuller and K.P. stood nearby. Other people mingled in the parking lot. This evidence was more than sufficient to sustain the defendant's convictions of aggravated assault and reckless endangerment.

## II. *Exclusion of Evidence*

The defendant asserts that the trial court erred by excluding from evidence Mr. Postles' January 2005 convictions of aggravated assault and aggravated burglary, which convictions he claimed related to a 2004 incident involving Ms. Fuller. He argues that the convictions should have been admitted under the terms of Tennessee Rule of Evidence 609 and that the acts underlying the convictions should have been admitted under the terms of Tennessee Rule of Evidence 404. The State asserts that the trial court did not err. We consider each potential avenue of admission.

### A. *Rule 609*

Prior to trial, the defendant moved the trial court for permission to admit into evidence Mr. Postles' January 2005 convictions of aggravated assault and aggravated burglary, for which Mr. Postles served a term of incarceration that ended in 2008. The defendant conceded that the convictions fell outside of the 10-year time proscription in Rule 609 but argued that the probative value of the convictions substantially outweighed any potential prejudicial effect. The State objected on grounds of staleness and relevance. The trial court excluded the evidence, ruling "that the probative value of the conviction does not substantially outweigh its prejudicial effect," particularly given that "the only reason the conviction could possibly come in is to show impeachment."

-8-

Evidence Rule 609 permits the admission of "evidence that the witness has been convicted of a crime" solely "[f]or the purpose of attacking the credibility of a witness." Tenn. R. Evid. 609(a). The rule contains a time limitation, however, that bars the use of convictions when "more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution." Tenn. R. Evid. 609(b). By way of exception, the proponent of such evidence may seek admission of an otherwise stale conviction by providing "advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." *Id.* Additionally, a stale conviction remains inadmissible unless the trial court "determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." *Id.* Importantly, "'evidence' of a prior conviction admissible under Rule 609(a) is limited to the fact of a former conviction and the crime that was committed" and does not allow admission of the details of the offense. *State v. Taylor*, 993 S.W.2d 33, 34 (Tenn. 1999). We review the trial court's determination of this issue via an abuse of discretion standard. *State v. Thompson*, 36 S.W.3d 102, 110 (Tenn. Crim. App. 2000).

Here, the defendant concedes that Mr. Postles' prior convictions fell outside the time limitation in Rule 609 but argues that the probative value of the evidence outweighed its prejudicial effect. We disagree. The convictions were nearly 15 years old at the time of the offenses and more than 15 years old by the time of the defendant's trial. The fact that Mr. Postles was convicted of assault and aggravated burglary more than a decade before the defendant's trial was not relevant. Moreover, the record reflects that the defendant wanted to admit more than the fact of Mr. Postles' prior convictions; he wanted to admit evidence that Mr. Postles had previously assaulted Ms. Fuller. Rule 609 does not permit the admission of the underlying facts of the convictions, and, even if it did, the staleness of the facts rendered them irrelevant. No evidence indicated that Mr. Postles had harmed or even threatened to harm either Ms. Fuller, K.P., or the defendant at any point in the more than 10 years following his release from custody. To the contrary, the evidence indicated that Ms. Fuller and Mr. Postles had established, at the very least, a cordial relationship that allowed them to co-parent K.P. Mr. Postles drove K.P. to school and participated in her school activities. Nothing suggested any continuing animosity between Mr. Postles and Ms. Fuller that might have made his earlier assault of her relevant in the defendant's trial. Consequently, the trial court did not abuse its discretion by refusing to admit Mr. Postles' prior convictions.

## B. Rule 404

The defendant argues that evidence that Mr. Postles had previously assaulted Ms. Fuller should have been admitted via Tennessee Rule of Evidence 404 as proof of Mr.

Postles' character for violence in support of the defendant's claim that he acted in self-defense.

During his cross-examination of Mr. Postles, the defendant asked Mr. Postles if he had "an anger problem," and Mr. Postles replied that he did not. The defendant then asked Mr. Postles whether he "had ever hit anyone out of anger," and the State objected. The defendant argued that, because he intended to claim that he acted in self-defense, "specific acts that go towards the character of violent acts are allowed to be introduced under 605." The State objected on grounds that the evidence was not relevant, and the defendant replied that his "defense would be self-defense" and asked the court for a jury-out hearing. The court sustained the objection, finding that the defendant had not yet established evidentiary relevance. The defendant then argued that the evidence was admissible under Tennessee Rule of Evidence 404(a)(2) as "proof of a victim's pertinent character for violent behavior to help establish if the victim was the aggressor." The court ruled that although the evidence *could* be admissible via Rule 404(a)(2), the defendant had not yet "put on some proof that may somehow make it relevant." The court also observed that evidence that Mr. Postles had committed a previous assault "only becomes relevant if the defendant knew about it prior to the incident."

The defendant made a second attempt to admit the evidence during his direct examination of Ms. Fuller when he asked her, "Has anything happened in the past with Mr. Postles that would give you reason to be scared of him?" The State objected, and the court ruled that the evidence was not admissible because the 15-year-old assault was not "relevant to what was taking place out there that day." The court also noted that the defendant had not presented any evidence to indicate that the defendant knew about the prior assault and that his knowledge affected his decision to act.

The defendant attempted a third time to admit the evidence during his own direct examination testimony. The defendant testified that he knew "the history" between Ms. Fuller and Mr. Postles and that, as a result, "I don't trust him." The defendant argued that he intended to offer "specific acts that the defendant knows the victim had done in the past to show that Mr. Postles was the primary aggressor" and to explain why the defendant "believed Mr. Postles was going to strike Ms. Fuller." He claimed that the evidence supported his claims of self-defense and defense of a third party. The court, noting that "[t]here has been absolutely no testimony there was anything other than a verbal argument," ruled that an incident that occurred "14 years prior" was not relevant.

Tennessee Rule of Evidence 404 provides:

(a) Character Evidence Generally. Evidence of a person's character or trait of character is not admissible for the purpose

-10-

of proving action in conformity therewith on a particular occasion, except:

. . . .

(2) Character of Alleged Victim. In a criminal case, and subject to the limitations imposed by Rule 412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor;

(3) Character of Witness. Evidence of the character of a witness as provided in Rules 607, 608, and 609.

Tenn. R. Evid. 404(a)(2).

The law distinguishes evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor from evidence of prior acts of violence used to establish the defendant's fear of the victim. *State v. Ruane*, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). Evidence of prior acts of violence committed by the victim may be used to corroborate a claim that the victim was the first aggressor even when the defendant has no knowledge of the acts. *Id.* at 779, 781. Before the evidence can be admitted, however, the issue of self-defense must be raised by the proof and not simply by statements of counsel, a factual basis must exist for the defendant's claim that the victim possessed the character of a first aggressor, and the probative value of the evidence must outweigh the danger of unfair prejudice. *See generally id.*

Here, although the defendant proceeded with a claim of self-defense, the proof did not raise the issue at the time the defendant sought admission of the evidence. To the contrary, when the defendant offered the evidence, the proof suggested nothing more than an argument between Ms. Fuller and Mr. Postles. Although the evidence established that Mr. Postles had struck K.P., both Mr. Postles and K.P. characterized the blow as "spanking." Ms. Fuller did not seek the defendant's intervention or protection and, indeed, told him to go inside so that she could resolve the conflict with Mr. Postles. A factual basis existed for the defendant's claim that Mr. Postles had previously assaulted Ms. Fuller, but that assault occurred more than a decade before the argument at issue. The defendant presented no evidence of a factual basis to support a claim that Mr. Postles had acted as the first aggressor in *any* encounter in the nearly 15 years between his conviction for assaulting Ms. Fuller and the argument at issue. Finally, given the age of the prior act

and the generally amicable nature of the relationship between Ms. Fuller and Mr. Postles at the time of the argument, the probative value of the evidence was outweighed by the danger of unfair prejudice.

When the defendant is aware of the victim's prior acts of violence, they are admissible to establish that the defendant's fear of the victim was reasonable, and the defendant may testify to those violent acts perpetrated by the victim of which he or she is aware. *Id.* at 779. In this case, however, the defendant did not testify that he feared Mr. Postles. He said that he did not trust Mr. Postles and that he thought that Mr. Postles might strike Ms. Fuller, but he did not testify that he feared for his life or the lives of Ms. Fuller or K.P. Indeed, he could not reasonably make such a claim given that Mr. Postles was unarmed, that he had not threatened either Ms. Fuller or K.P. with death or serious bodily injury, and that, at the time the defendant decided to arm himself with a loaded handgun, Ms. Fuller and Mr. Postles were doing nothing more than arguing.

Under these circumstances, the trial court did not err by excluding the evidence.

### III. Self-Defense Instruction

In his final claim, the defendant challenges the trial court's refusal to provide a jury instruction on self-defense. The State asserts that the trial court did not err because the defense was not fairly raised by the proof.

Because the constitutional right to trial by jury encompasses the right to a correct and complete charge of the law, the trial court's failure to fulfill its duty to give a complete charge of the law applicable to the facts of a case deprives the defendant of the constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The trial court must provide all instructions properly raised by the proof, regardless of the instructions requested by either party. *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). To evaluate a claim of error in the jury charge, this court reviews the charge in its entirety. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

The trial court's duty to provide complete and accurate instructions to the jury "extends to general defenses, such as self-defense, defense of another, or defense of a habitation," *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (citation omitted), when the defense has been "fairly raised by the proof," T.C.A. § 39-11-203(c). "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. "When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020), *cert. denied*, 141 S. Ct. 427 (2020) (citing *Hawkins*, 406 S.W.3d at 129). When self-defense has been fairly raised by the proof, "the trial court must submit the defense to the jury and the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply." *Benson*, 600 S.W.3d at 903 (citation omitted).

The trial court, as gatekeeper, makes the determination whether self-defense has been fairly raised by the proof. *See id.* In making this determination, the trial court may infer "from the evidence as it is viewed in the light most favorable to the defendant" that the defendant acted out of a reasonable fear of imminent bodily harm, and "a defendant need not testify that he reasonably feared imminent bodily harm" to be afforded an instruction on self-defense. *Id.* at 904 (citations omitted).

Code section 39-11-611 sets the parameters of self-defense:

(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

-13-

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b) (2018). "The test of 'reasonable belief' places the emphasis on the defendant's reliance upon reasonable appearances rather than exposing the defendant to the peril of criminal liability where appearances were deceiving and no actual danger existed." *Id.*, Advisory Comm'n Comments. Under the three-part test, "the defendant must reasonably believe he is threatened with imminent loss of life or serious bodily injury; the danger creating the belief must be real or honestly believed to be real at the time of the action; and the belief must be founded on reasonable grounds." *Id.*

In our view, the trial court did not err by refusing a jury instruction on self-defense because it was not fairly raised by the proof. The evidence established that Mr. Postles upset K.P. during their interaction in Mr. Postles' vehicle and that K.P. was visibly upset when she walked over to Ms. Fuller. Mr. Postles and Ms. Fuller argued about the interaction and about whether K.P. would be required to go to with Mr. Postles despite that she was upset with him. The evidence, including the defendant's own testimony, established that the defendant inserted himself into the argument and began arguing with Mr. Postles. Ms. Fuller told the defendant to go inside and allow her to handle the situation, from which the jury could infer that Ms. Fuller did not fear that Mr. Postles might harm either her or K.P. The proof unequivocally indicated that Mr. Postles was not armed and that he did not threaten anyone, let alone the defendant, with imminent death or serious bodily injury. Indeed, the defendant went into the apartment, removing himself easily from the situation, and Mr. Postles did not attempt to stop him. The defendant then armed himself and returned outside, where Ms. Fuller and Mr. Postles were still arguing. No evidence indicated that the nature of their interaction changed in any way while the defendant was inside. Nevertheless, the defendant pointed a loaded handgun at the unarmed victim. Even Ms. Fuller, the only person who, based upon the evidence, could possibly have had reasonable grounds to fear the danger of imminent bodily injury, testified that the defendant's actions were completely unnecessary.

*IV. Conclusion*

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-14-